UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
UNITED STATES OF AMERICA        )
                                    )        Court No.:  14-cr-10363-RGS-9
        v.                          )
                                    )
GREGORY A. CONIGLIARO,          )
                                    )
        Defendant.                  )
_____)

**GOVERNMENT'S OPPOSITION TO DEFENDANT GREGORY CONIGLIARO'S
MOTION FOR JUDGMENT OF ACQUITTAL OR, ALTERNATIVELY, A NEW TRIAL**

The United States of America hereby opposes Defendant Gregory Conigliaro's Motion for

Judgment of Acquittal or, Alternatively, a New Trial (Doc. No. 1819) [hereinafter, the "Motion"].

After an eight-week jury trial in this case, defendant Conigliaro now stands before this Court

convicted of conspiring to defraud the United States in violation of 18 U.S.C. § 371.  Specifically,

a jury unanimously found that Conigliaro conspired with others at New England Compounding

Center ("NECC") to represent to the Food and Drug Administration ("FDA") and the

Massachusetts Board in Registration in Pharmacy ("MABOP") that NECC was operating as a

pharmacy dispensing patient-specific drugs, when in actuality it operated like a manufacturer

distributing drugs in bulk.  The jury heard overwhelming evidence that Conigliaro knew that

NECC was dispensing drugs in bulk, but represented to the FDA and MABOP that it was not.

In his Motion and accompanying supporting memorandum (Doc. No. 1853), Conigliaro

presents three primary arguments in support of his claim for a judgment of acquittal.  First,

Conigliaro argues that even if the evidence demonstrated that he intended to defraud the FDA, it

was legally impossible to do.  Second, he argues that even if it was not legally impossible to

defraud the FDA, the defraud clause of Section 371 is unconstitutionally vague such that he was

not on notice that his misrepresentations to the FDA and MABOP were a crime.  Mem. in Support

of his Mot. for Judgment of Acquittal Pursuant to Rule 29 (Doc. No. 1853) [hereinafter "Rule 29

Memorandum"] at 9 (Jan. 25, 2019).  Lastly, Conigliaro argues that the evidence was insufficient

to find that he intended to defraud the FDA.  The government submits that there is no proper factual

or legal basis on which to overturn Conigliaro's conviction.  All three of his arguments are

unavailing, and based on dubious factual and legal assertions.

In his next memoranda (Doc. No. 1854), Conigliaro presents five evidentiary arguments in

support of his claim for a new trial.  None of his arguments support such a result, and, Conigliaro

cannot demonstrate that his conviction was a miscarriage of justice.  Accordingly, this Court

should reject Conigliaro's extraordinary request to overturn the jury's unanimous, discerning

verdict or grant a new trial.  Instead, Conigliaro's Motion should be denied.

## **LEGAL STANDARD**

The First Circuit has held that in evaluating a Rule 29 motion, a defendant is entitled to a

judgment of acquittal only if "the evidence, viewed in the light most favorable to the government,

could not have persuaded any trier of fact of the defendant's guilt beyond a reasonable doubt."

United States v. Bristol-Martir, 570 F.3d 29, 38 (1st Cir. 2009).  As this Court has previously

explained, "[j]udgments of acquittal are granted sparingly."  Mem. and Order on Def. Cadden's

Mot. for a Judgment of Acquittal or, in the Alternative, a New Trial, at 1 (Doc. No. 1135)

[hereinafter the "Cadden Order"].

In evaluating a defendant's motion for judgment of acquittal, the Court "cannot weigh

evidence or make credibility judgments."  United States v. Ofray-Campos, 534 F.3d 1, 31 (1st Cir.

2008).  "The government's evidence is not insufficient simply because the defense presented a

competing scenario through its own witnesses.  Where an evidentiary conflict turns on witness

credibility, the jury decides whom to believe." <u>United States v. Ayala-Garcia</u>, 574 F.3d 5, 11 (1st Cir. 2009).

Similarly, with respect to a Rule 33 motion for a new trial, the First Circuit has explained, "[t]he remedy of a new trial is rarely used; it is warranted only where there would be a miscarriage of justice or where the evidence preponderates heavily against the verdict." <u>United States v. Rodriguez-De Jesus</u>, 202 F.3d 482, 486 (1st Cir. 2000).

## **ARGUMENT**

### I. **Conigliaro is Not Entitled to a Judgment of Acquittal.**

None of Conigliaro's three arguments for why he should be entitled to a judgment of acquittal justify the extraordinary step of overturning the jury's unanimous verdict in this case.

### A. It Was Not Legally Impossible to Conspire to Defraud the FDA.

In his Rule 29 memorandum, Conigliaro repeats an earlier argument put forth in his renewed motion to dismiss, that is, that the conspiracy to defraud charge is a legal impossibility because there was no law defining a clear distinction between a compounder and a drug manufacturer. Conigliaro argues that "if the goal of an alleged conspiracy is legally impossible to accomplish, an alleged conspirator cannot be guilty of the crime of conspiracy." Mem. at 15. Conigliaro's argument misconstrues both the law as applied to compounding pharmacies at the time, and the law related to conspiracies. As the First Circuit has made clear, "the defraud clause does not depend on allegations of other offenses." <u>United States v. Barker Steel Co.</u>, 985 F.2d 1123, 1131 (1st Cir. 1993).

#### 1. Conigliaro Mischaracterizes the Law as It Related to Compounding.

Before analyzing the law of conspiracy as it applies to this case, it is important to first correct Conigliaro's mischaracterization of the law as it related to compounding. Specifically, Conigliaro argues that the Supreme Court's holding in <u>Thompson v. Western States Med. Ctr.</u>, 535

U.S. 357 (2002), meant that "there was no legal distinction between a compounding pharmacy and a drug manufacturer," Rule 29 Mem. at 3, and therefore, the FDA lacked jurisdiction over compounding pharmacies.  This argument is legally incorrect, and in fact, the opposite was true. As described further below, the Supreme Court *never* invalidated Congress's definition of compounding. See Western States Med. Ctr., 535 U.S. at 366 ("Because neither party petitioned for certiorari on the severability issue, we have no occasion to review that portion of the Court of Appeals' decision.").  Moreover, the Food and Drug Administration Modernization Act of 1997 ("FDAMA") at issue in that case was a *safe harbor* that exempted compounding pharmacies from meeting the more stringent FDA new drug requirements that applied to drug manufacturers.  Thus, any invalidation of FDAMA by the Supreme Court meant *greater, not less*, FDA authority over compounding pharmacies.

As the United States Supreme Court explained, drug compounding is "a process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a medication tailored to the needs of an individual patient."  Western States Med. Ctr., 535 U.S. at 360-61.  "Pharmacists may provide compounded drugs to patients only *upon receipt of a valid prescription* from a doctor or other medical practitioner licensed to prescribe medication." Id. at 361 (emphasis added).  In 1938, Congress passed the Food, Drug, and Cosmetic Act ("FDCA"), which gave the FDA broad authority over any new drug introduced into the marketplace.  The FDA established procedures for obtaining approvals for new drugs, as well as manufacturing and inspection requirements.

The Supreme Court in its decision further explained the history of the FDA and compounding:

> For approximately the first 50 years after the enactment of the FDCA, the FDA generally left regulation of compounding to the States.  Pharmacists continued to provide patients with compounded drugs without applying for FDA approval of those drugs.  The FDA

eventually became concerned, however, that some pharmacists were manufacturing and selling drugs under the guise of compounding, thereby avoiding the FDCA's new drug requirements.  In 1992, in response to this concern, the FDA issued a Compliance Policy Guide, which announced that the "FDA may, in the exercise of its enforcement discretion, initiate federal enforcement actions ... when the scope and nature of a pharmacy's activities raises the kinds of concerns normally associated with a manufacturer and ... results in significant violations of the new drug, adulteration, or misbranding provisions of the Act." Compliance Policy Guide 7132.16….The Guide expressed concern that drug products "manufactured and distributed in commercial amounts without the FDA's approval" could harm the public health.

In light of these considerations, the Guide announced that it was FDA policy to permit pharmacists to compound drugs *after receipt of a valid prescription for an individual patient* or to compound drugs in "very limited quantities" before receipt of a valid prescription if they could document *a history of receiving valid prescriptions* generated solely within an established professional practitioner-patient-pharmacy relationship and if they maintained the prescription on file as required by state law.

Id. at 362-63 (emphasis added).

Five years later, Congress codified the FDA's compliance policy guide in FDAMA. "Much like the FDA's 1992 policy, FDAMA created a safe harbor from the FDCA's new drug approval requirements so long as a compounding pharmacist observed a number of requirements designed to ensure that the pharmacist was engaged in traditional compounding rather than disguised manufacturing." Medical Center Pharmacy v. Mukasey, 536 F.3d 383, 390-91 (5th Cir. 2008).  To qualify as a compounded drug, the pharmacy had to meet several statutory requirements, including that the drugs "must be compounded by a licensed pharmacist or physician in response to a valid prescription for an identified individual patient." Western States Med. Ctr., 535 U.S. at 364.  One of the other requirements was the prohibition of advertising or promotion of the compounded drug.  Id.

In <u>Western States</u>, the Supreme Court found that this latter requirement, a prohibition on advertising or promotion of the compounded drug, was unconstitutional.  <u>Id.</u> at 377.  In doing so, the Court held that the FDA's stated interest "of drawing a line between compounding and large-scale manufacturing" could be accomplished without the offending advertising provision, "such as the requirement that compounding only be conducted in response to a prescription or a history of receiving a prescription."  <u>Id.</u> at 372.

Following the <u>Western States</u> decision in 2002, FDAMA was invalidated by the Ninth Circuit which had found the unconstitutional advertising provisions could not be severed from the rest of the law.  The effect of this ruling was to subject compounding pharmacies to the new drug approval, manufacturing, and inspection provisions of the FDCA as well as FDA's enforcement authority.  There was no longer a legal safe harbor from the FDCA's rules governing manufacturers.  This was *an increase* in the FDA's jurisdiction over compounding pharmacies as compared to the framework established in FDAMA.  To alleviate the concerns of the compounding pharmacy industry in response to this decision, the FDA quickly issued the 2002 Compliance Policy Guide ("CPG") a month after the <u>Western States</u> decision, <u>see</u> exh. 918, to inform the industry that it would continue to adhere to the FDAMA framework and exercise enforcement discretion with respect to the compounding of drugs in response to patient-specific prescriptions.  And it would follow the CPG in order to do so.

Six years later, in 2008, the Fifth Circuit made explicit, that which was implicit in FDAMA, that compounded drugs fell within the FDCA's definition of a "new drug."  <u>Medical Center Pharmacy</u>, 536 F.3d at 406.  First, the Fifth Circuit found the unconstitutional advertising provision to be severable from the whole, and therefore, found the remainder of FDAMA to be valid.  <u>Id.</u> at 405.  The Fifth Circuit concluded that "[t]he conditional exception [outlined in FDAMA] makes

sense only if the 'new drug' definition is construed to apply to compounded drugs." Id.  Therefore, absent the statutory safe harbor of FDAMA or the FDA's enforcement discretion outlined in the CPG, compounding pharmacies would be subject to the drug approval, manufacturing, and inspection provisions of the FDCA.

Applying the legal framework to this case and Conigliaro's conviction, NECC was making new drugs, as defined in the FDCA, and was subject to the jurisdiction of the FDA.  Thus, because NECC was (undisputedly) not following the FDCA's new drug requirements, the question of whether NECC was legally making drugs was whether NECC met the safe harbor factors outlined in FDAMA and the 2002 CPG, that is, compounding drugs in response to patient-specific prescriptions.  If it was not doing so, it was not legally making drugs.

     2.  <u>Conigliaro's Conviction for Conspiring to Defraud the FDA Was Not Legally Impossible.</u>

In his Rule 29 memorandum, Conigliaro argues that because there was not an underlying statutory offense that he committed, his conviction for conspiring to defraud the FDA is legally impossible.  Conigliaro's argument is meritless.

Legal impossibility occurs when "the intended acts, even if completed, would not amount to a crime." Id. (internal quotation marks omitted).  The First Circuit has recognized that ordinarily legal impossibility is not a defense to a conspiracy charge "because a conspiracy charge does not require a completed crime."  <u>United States v. Fernandez</u>, 722 F.3d 1, 31 (1st Cir. 2013).  However, "a more potent form of the doctrine," referred to as "pure legal impossibility," occurs "when no statute proscribes the result that the defendant expected, desired, and intended to achieve."  Id. (internal citation omitted).  "For example, a hunter cannot be convicted of attempting to shoot a deer if the law does not prohibit shooting deer in the first place."  <u>United States v. Hsu</u>, 155 F.3d 189, 199 n. 16 (3d Cir. 1998).

But the analysis in <u>Fernandez,</u> which is the only case Conigliaro cites, applies only to the *first clause* of § 371, which proscribes conspiring to commit *another federal offense*. In that scenario, the impossibility exists because that the predicate offense was not a crime.[1] But Conigliaro was not charged with a conspiracy to commit a federal offense. He was charged and convicted for violating the *second clause* of § 371, that is, conspiring to defraud the United States. Legally impossibility is not a defense to conspiring to interfere with the lawful functions of the government.

In <u>United States v. Morosco</u>, 67 F. Supp. 3d 483 (D. Mass. 2014), Judge Woodlock faced this precise issue of whether legal impossibility applies to the defraud clause of § 371. In that case, the defendant was charged with manipulating evaluations of public housing units in an effort to defraud the United States Department of Housing and Urban Development, a federal agency. <u>Id.</u> at 485. The defendants argued that they should not be charged with violating § 371 because manipulating HUD evaluations is not an underlying crime. <u>Id.</u> at 488. Judge Woodlock rejected that argument, noting "[t]he defraud clause of the conspiracy statute does not require the commission of a specific offense or the commission of any crime other than the conspiracy itself." <u>Id.</u> In affirming that ruling, the First Circuit explained:

> [u]ndaunted, [the defendants] also suggest that because no statute or regulation criminalizes receiving a list of sample units before any HUD inspection, the government could not prosecute them under section 371. But our cases take all the wind out of their sails, holding as they do "that lawful activity may furnish the basis for a" section 371 conspiracy conviction.

---

[1] For example, in <u>Fernandez</u>, the defendants were charged with violating the Travel Act, 18 U.S.C. § 1952, that prohibits interstate travel for the purpose of committing a crime. 772 F.2d at 7. The crime that the defendants were alleged to have committed was the Puerto Rican state-law crime of bribery. <u>Id.</u> While the defendants were convicted at trial of violating the Travel Act, the First Circuit noted that their travel occurred two weeks after the state-law bribery statutes were repealed. <u>Id.</u> at 31. In vacating the conviction, the First Circuit explained, "[d]efendants were conspiring to do something that would not be prohibited by these Puerto Rico bribery laws on the date they planned to do it." <u>Id.</u> at 32. The reasoning and logic of <u>Fernandez</u> does not apply to the situation here, where she was convicted with interfering with the lawful functions of the United States, conduct which was (and still is) proscribed conduct.

United States v. Morosco, 822 F.3d 1, 6-7 (1st Cir. 2016).  In reaching this decision, the First

Circuit relied on long-standing circuit precedent that a conviction of defrauding the United States

does not require underlying unlawful activity.   See Barker Steel Co., 985 F.2d at 1131

("Conspiracy to thwart the operation and purpose of a government program through deceit and

trickery is prohibited by § 371."); United States v. Hurley, 957 F.2d 1, 4 (1st Cir. 1992) (rejecting

argument that absence of statutory prohibition precludes conviction because "[o]ur caselaw makes

it clear that lawful activity may furnish the basis for conviction under § 371); United States v.

Tarvers, 833 F.2d 1068, 1075 (1st Cir. 1987) ("The statute does not require that the means used to

achieve the unlawful goal of the conspiracy be unlawful.").  As the First Circuit explained more

fully in Barker Steel:

> The essence of the defendants' theory is that if no other federal law
> or regulation proscribes alleged conduct, then the defendants cannot
> be held criminally responsible pursuant to § 371 because they owe
> no duty to the federal government.  The defendants' theory reflects
> a misunderstanding of the function of the two clause of § 371.  If the
> second clause were interpreted to require commission of a specific
> offense, it would have the same meaning as the first clause thus
> rendering the second clause redundant.

Barker Steel Co., 985 F.2d at 1131.  Put another way, "an individual who elects a course of

fraudulent self-help may not escape the consequences by urging that the statute which he sought

to evade did not apply."  United States v. Weed, 873 F.3d 68, 73 (1st Cir. 2017) (rejecting legal

impossibility defense that "no statute prohibited" the activity defendants engaged in and affirming

convictions).

In this case, Conigliaro was convicted of conspiring with others at NECC to deceive the

FDA into thinking one thing (that NECC was only dispensing drugs based on patient-specific

prescriptions) when another thing was in fact true (they were not).  He did so by misrepresenting

to the FDA and MABOP that NECC was only dispensing drugs pursuant to patient-specific

prescriptions when in fact he knew that was not true.  As explained in the section supra, the FDA

had jurisdiction over the production of "any new drug," including the drugs compounded at NECC.

The lack of a statute or clear regulation by which the FDA defined compounding pharmacies and

manufacturers is irrelevant to the fraud perpetrated by Conigliaro and his co-conspirators by lying

to the FDA and MABOP about NECC's true activities in order to try to conceal them.

　　　　In his Rule 29 memorandum, Conigliaro argues that he is entitled to have his conviction

overturned because of the uncertainty within the FDA regarding its jurisdiction over compounding.

This argument is without legal merit.  As this Court has previously explained, it does not matter

whether "an FDA function was 'actually interfered with' by the conspiracy.  [The defendants']

argument ignores a fundamental principle:  That the conspiratorial 'agreement is a distinct evil,

which may exist and be punished whether or not the substantive crime ensues.'"  Mem. and Order

on Defendants' Motion to Dismiss Count III at 7-8 (Sept. 21, 2016) (quoting United States v.

Jimenez Recio, 537 U.S. 270, 274 (2003)).  At trial, this Court similarly and correctly instructed

the jury: "the government is not required to prove that the alleged conspiracy actually succeeded

in deceiving the FDA."  Trial Tr. at 211 (Dec. 4, 2018).  Conigliaro's argument must fail on this

ground alone.

　　　　Nevertheless, Conigliaro's argument fails even under his incorrect version of the law

because the uncontroverted testimony at trial was that NECC's fraudulent scheme *did in fact*

*succeed* in deceiving the FDA and MABOP.  Dr. Janet Woodcock, the head of the FDA's Center

for Drug Evaluation and Research, testified that:

> [i]f a company was maintaining that it was getting – it was
> compounding in response to prescriptions, then they would be
> within the traditional compounding scheme.  And therefore, the
> FDA would have enforcement discretion, it would not go after
> them…[s]o that would keep them under the regulation of their state
> board of pharmacy and not move them into being a drug

> manufacturer.  But if they were getting staff members or other non-
> patient names on prescriptions, then they would be a manufacturer
> under the scheme in place at that time.

Trial Tr. at 111-12 (Nov. 19, 2018).  Samia Nasr, the head of the FDA's Compounding Team at

the time further testified that NECC never disclosed it was creating fraudulent prescriptions or

bulk-shipping drugs to customers.  "They always kept saying: We do patient-specific.  We are a

compounding pharmacy.  We are regulated by the state…the FDA does not have jurisdiction over

us."  Trial Tr. at 43 (Nov. 15, 2018); see also Trial Tr. at 17 (Nov. 19, 2018) (testimony of Dr.

Janet Woodcock) (testifying that NECC "represented repeatedly that they were responding to

prescriptions).  Even during the outbreak investigation in October 2012, FDA Investigator

Degarmo testified that Cadden, who was with Conigliaro at the time, told her that NECC was

dispensing drugs pursuant to patient-specific prescriptions.  Trial Tr. at 160 (Nov. 16, 2018).  Even

as patients around the country were getting sick, they tried to maintain the fiction and deceive the

regulators until recalled drugs uncovered the scheme.  See Trial Tr. at 155 (Nov. 14, 2018)

(testimony of MABOP Investigator Sam Penta) (testifying that MABOP did not discover NECC

was shipping non-patient-specific drugs until Friday, October 5th when he observed recalled drug

packages).

As a result of this fraudulent prescription scheme, the FDA did not get a true understanding

of the scope of NECC's business practices until it was over.  See e.g., Trial Tr. at 64 (Nov. 15,

2018) (testimony of Samia Nasr) ("[W]e could not determine [if NECC was a manufacturer]

because they would not allow us to see what they were doing to start with."); Trial Tr. at 100 (Nov.

15, 2018) (testimony of Samia Nasr) ("[T]hey never told us what they were doing.  We tried to

understand and have them explain to us what they do, but they never allowed us to know.").  As a

result, the FDA considered NECC to be a pharmacy and deferred regulatory jurisdiction to

MABOP.  Nasr was clear that had the FDA known what Conigliaro and his conspirators were

doing, "we would walk in and do the inspection based on the GMP right away."  Trial Tr. at 101

(Nov. 15, 2018); see also Trial Tr. at 164 (Nov. 16, 2018) (testimony of FDA Investigator

Degarmo) (testifying that MABOP turned over jurisdiction to FDA upon discovery of non-patient-

specific drugs).  NECC's fraud had in fact succeeded.

In sum, because, as a legal matter, the defense of legal impossibility does not apply to

conspiring to defraud the United States, Conigliaro's Motion should be denied.  Moreover, as a

factual matter, the evidence at trial demonstrated not only was it factually possible to defraud the

United States, it actually occurred.

## B.  Section 371 is not Unconstitutionally Vague.

Conigliaro's next argument why this Court should overturn his conviction is that his

criminal conduct was not "plainly and unmistakably within the province of § 371."  Rule 29 Mem.

at 9.  He previously raised this vagueness argument in his first motion to dismiss the indictment,

and this Court rejected it.  The Court should reject it again.

Conigliaro's argument is foreclosed by longstanding precedent from the Supreme Court,

this Circuit, and courts throughout the country.  See e.g., Hammerschmidt v. United States, 265

U.S. 182, 188 (1924) (defining the parameters of § 371 proscribed conduct); Morosco, 67 F. Supp.

3d at 488-89 (rejecting vagueness challenge because "[t]he statute itself, as construed by the First

Circuit in Barker Steel, makes it reasonably clear that § 371 may be applied to conspiracies to

defraud the United States even when the underlying acts standing alone are not criminal"); United

States v. Goldberg, 105 F.3d 770, 775 (1st Cir. 1997) (rejecting vagueness challenge to § 371

defraud clause even where facts "fall within the outer bounds of section 371"); United States v.

Derezinski, 945 F.2d 1006, 1011 (8th Cir. 1991) (holding that "an ordinary person would have no

difficulty understanding that [the defendant] attempted to impair, obstruct and defeat the Treasury

Department in its lawful function of collecting income taxes, or that such activity is illegal under

section 371"). Even the cases cited by Conigliaro do not support the relief he requests. <u>See</u> Rule 29 Mem. at 10 (<u>citing</u> <u>United States v. Coplan</u>, 703 F.3d 46, 61 (2d Cir. 2012)); <u>but</u> <u>see</u> <u>id.</u> at 62 ("[B]ecause the <u>Klein</u> doctrine derives from and falls within the scope of the law of the Circuit (itself grounded on long-lived Supreme Court decisions), we reject the defendants' challenge to the validity of that theory of criminal liability.").

This Court has previously ruled on this issue that "[l]ongstanding judicial interpretations of § 371 have made clear that the statute's defraud clause constitutionally proscribes efforts to thwart the operation and purpose of a government program through deceit and trickery. I can add nothing to this long line of precedent in the context of this case." Mem. and Order on Defendants' Motion to Dismiss Count III at 9 n.5 (Sept. 21, 2016). There is no reason for this Court to rule differently on this issue now. Accordingly, the Motion should be denied on this ground as well.

### C. A Reasonable Juror Could Find that Conigliaro Conspired with Others at NECC to Defraud the FDA.

Conigliaro's last argument in his Rule 29 memorandum is that the evidence was insufficient to find that he acted with the intent to defraud the FDA. This is not true. In fact, based on the evidence presented at trial, a reasonable juror could certainly find, as these twelve jurors unanimously did, that Conigliaro conspired with co-defendants Barry Cadden, Robert Ronzio, and others to defraud the FDA and MABOP. Accordingly, the Motion should be denied on this ground.

### 1. Conigliaro Knew NECC was Dispensing Drugs Without Patient-Specific Prescriptions.

In his memorandum, Conigliaro attempts to minimize his role at NECC. Instead, the evidence at trial demonstrated that Conigliaro had extensive responsibility at NECC, particularly with respect to interacting with federal and state regulators. Conigliaro was part-owner of NECC, and had been involved with NECC since the founding of the company in 1998. Trial Tr. at 156-57 (Nov. 16, 2018) (testimony of FDA Investigator Degarmo). Conigliaro's title was vice

president and general manager of NECC.  Trial Tr. at 156 (Nov. 17, 2018) (testimony of FDA Investigator Degarmo); Exh. 435a (letter to the FDA listing Conigliaro's title as "General Manager"); Exh. 453 (letter to the Oregon Board of Pharmacy listing Conigliaro's title as "Vice President and General Manager").  As part of his role, Conigliaro attended NECC's management meetings.  Trial Tr. at 73 (Dec. 3, 2018) (testimony of Robert Ronzio).  Conigliaro also signed licenses on behalf of NECC.  Trial Tr. at 160 (Nov. 28, 2018) (testimony of Beth Reynolds).

With respect to NECC's dispensing practices, the jury heard overwhelming evidence that NECC was shipping drugs without patient-specific prescriptions for over a decade.  Specifically, Kevin Kinkade, the former executive director of the Missouri Board of Pharmacy ("MOBOP"), testified that the board discovered in 2002 that NECC was shipping drugs into the state without patient-specific prescriptions.  Trial Tr. at 66-67 (Nov. 8, 2018).  MOBOP instructed NECC to stop since the practice of sending drugs into the state without patient-specific prescriptions qualified as manufacturing.  Trial Tr. at 67 (Nov. 8, 2018).  In 2003, South Dakota reported to MABOP that NECC was attempting to ship non-patient specific drugs into the state.  Exh. 696.  In 2004, pharmacists in Iowa and Wisconsin reported that NECC was attempting to ship drugs for office use into their respective states.  Exh. 697.

The jury saw e-mails that demonstrated that NECC was shipping drugs without any corresponding patient names for years.  For example, in one e-mail, co-defendant Sharon Carter wrote a sales representative that "[t]his is a long standing account (2005) and they have NEVER given us [patient] names…I will let this order go…."  Exh. 614; see also Exh. 92 (e-mail from Carter to sales representative) (approving order to ship without patient names for customer who had purchased drugs since 2009 without providing patient names); Exh. 517 (e-mail from Cadden

to sales representative and Robert Ronzio) (noting that facility "has ordered 252 times from us and never provided patient names").

The jury heard that in 2008, MOBOP found that NECC was once again shipping drugs into the state that were not patient-specific. Trial Tr. at 85 (Nov. 8, 2018) (testimony of Tom Glenski). MOBOP contacted NECC, and in response, Conigliaro provided a list of prescriptions shipped into the state for the past year. Exh. 438. Conigliaro's submission revealed that NECC was sending drugs into the state in bulk without patient-specific prescriptions with his knowledge. Specifically, Conigliaro's submission revealed that NECC was shipping drugs in the names of the facility, reusing patient names, backfilling patient names, and using doctor's names for prescriptions. Trial Tr. at 89-95 (Nov. 8, 2018). MOBOP Chief Inspector Tom Glenski testified that NECC "was in violation of a compounding regulation that said…compounding could only be done by patient-specific prescription." Trial Tr. at 90 (Nov. 8, 2018). Conigliaro told MOBOP that NECC was getting contracts for hospitals that alleviated the need for NECC to get prescriptions. Trial Tr. at 105 (Nov. 8, 2018). Glenski testified that contracts were not legal under the law. Trial Tr. at 105 (Nov. 8, 2018). In the spring of 2011, Conigliaro himself travelled to Missouri to try and convince MOBOP to allow NECC to continue to ship non-patient-specific drugs into the state. Kimberly Grinston, the executive director of MOBOP, testified "once you're past that patient-specific prescription world, and you're now doing what we call…bulk compounding, compounding in bulk, you're now a manufacturer. And those manufacturers need to be following CGMP and FDA requirements and under FDA oversight." Trial Tr. at 161 (Nov. 8, 2018). Grinston testified that she told Conigliaro during their meeting that NECC should "register with the FDA." Trial Tr. at 162 (Nov. 8, 2018).

The jury also heard that the Colorado Board of Pharmacy ("COBOP") discovered NECC was shipping drugs into the state without patient-specific prescriptions. Wendy Anderson, the program director of the COBOP testified that in 2011, a COBOP inspector discovered NECC was shipping drugs into the state without first obtaining a patient-specific prescription. Trial Tr. at 97-98 (Nov. 9, 2018). She testified, "[t]hey weren't for a patient. They did not have an order for a patient in order – prior to making the product and shipping it into the state." Trial Tr. at 98 (Nov. 9, 2018). In response, on April 15, 2011, COBOP issued a cease and desist order to NECC to stop the practice. Exh. 462. Anderson testified that following the issuing of the cease and desist order, she received an angry phone call from Conigliaro. Trial Tr. at 103-04 (Nov. 9, 2018). Anderson testified that Conigliaro was yelling at her, and telling her that NECC could ship drugs into the state the way that NECC was. Trial Tr. at 103-04 (Nov. 9, 2018). In June 2012, COBOP once again discovered that NECC was shipping drugs into the state without patient-specific prescriptions. At that point, COBOP verified with the FDA that NECC was not registered as a manufacturer. Trial Tr. at 112-13 (Nov. 9, 2018). Anderson testified that if a company was shipping drugs in bulk, the drugs should be "approved by the Food and Drug Administration, and they comply with all – with good manufacturing practices." Trial Tr. at 113 (Nov. 9, 2018). In response, COBOP notified MABOP about NECC's activities.

Lastly, the jury also heard that the Oregon Board of Pharmacy ("ORBOP") discovered NECC was shipping drugs into the state without patient-specific prescriptions. Specifically, ORBOP was notified by an Oregon hospital that an NECC sales representative had stated that NECC could sell drugs in bulk and the hospital could provide the names of the patients after the fact. Trial Tr. at 35-36 (Nov. 9, 2018). Michele Cale, a former ORBOP investigator, testified that the practice of backfilling patient names did not comply with the law. Trial Tr. at 38 (Nov. 9,

2018).  As Cale explained, the law required "a pre-scription and not a post-scription."  Trial Tr. at

38 (Nov. 9, 2018).  Cale also discovered that NECC was shipping drugs into the state in the name

of the facility, which also violated Oregon law: "all prescriptions have to be to a person.  It can't

be to an entity."  Trial Tr. at 39 (Nov. 9, 2018).  Cale reached out to NECC to inquire about the

company's practices, and Conigliaro responded that, "[w]hen compounding services have been

provided to an Oregon hospital, the service has been provided pursuant to a shared service

agreement."  Exh. 453.  Conigliaro also provided a detailed description of what was contained

within those shared service agreements.  Exh. 453.  The jury heard, however, that Conigliaro was

lying and no such agreements existed.  When Cale made repeated requests to see copies of NECC's

shared services agreements, Conigliaro, through his attorney, confessed that NECC did not have

any written agreements, but represented that "NECC adhered to verbal shared services agreements

with its hospital clients."  Exh. 447.  This was not true either.  Cale testified that she spoke to

NECC's hospital customers in Oregon and no one supported Conigliaro's or NECC's counsel's

statements about NECC's practices.  Trial Tr. at 60 (Nov. 9, 2018).  In a follow-up email to Cale,

NECC's attorney wrote, "I have confirmed with NECC that, to the best of their knowledge, all

prescription shipments to hospitals and surgery centers have been patient specific with patient

names known prior to shipment.  No patient names were filled in after shipments."  Exh. 459.

These statements were not true either.  On May 21, 2012, ORBOP instructed NECC to stop

shipping non-patient-specific drugs into the state.  Exh. 454.

Based on all of this evidence, including Conigliaro's own sometimes true, sometimes false

statements to regulators throughout the country, a reasonable juror could certainly find, as these

twelve jurors unanimously did, that Conigliaro was well aware that NECC was shipping drugs to

customers in bulk without patient-specific prescriptions and knew that this was not in compliance with the law.

2.  <u>Conigliaro and His Co-Conspirator Cadden Repeatedly Misrepresented to the FDA and MABOP that NECC was Only Dispensing Patient-Specific Drugs.</u>

The jury heard uncontroverted evidence that from 2002 through 2012, Conigliaro and his co-conspirator Cadden *always* represented to the FDA and MABOP that NECC was only dispensing patient-specific drugs.  For example, in 2002, at the same time when the MOBOP was citing NECC for shipping drugs in bulk, Cadden told FDA Investigator Kristina Donohue that NECC was only dispensing drugs pursuant to patient-specific prescriptions.  Trial Tr. at 14 (Nov. 14, 2018).  Specifically, Cadden told her that NECC was only dispensing drugs for about ten prescriptions per day.  Trial Tr. at 14 (Nov. 14, 2018).  Donohue testified that the issue of patient-specific prescriptions was important because it was one of the factors the FDA reviewed in determining whether a company should be classified as a pharmacy or a manufacturer.  Trial Tr. at 14 (Nov. 14, 2018).  During the second-day of the inspection, Cadden challenged the FDA's authority to be inside the NECC facility, and refused to answer any additional questions.  Trial Tr. at 13 (Nov. 14, 2018).

During a second FDA inspection, in October 2002, FDA Investigator Donohue testified that she inquired about patient-specific prescriptions again.  She testified that "Mr. Cadden stated they still had prescriptions," and were filling approximately 50 per day.  Trial Tr. at 20 (Nov. 14, 2018).  MABOP investigators that were accompanying Donohue during the inspection informed Cadden that Massachusetts law did not permit dispensing in bulk.  Trial Tr. at 21 (Nov. 14, 2018).  Cadden never informed the FDA or MABOP that MOBOP had discovered NECC was shipping drugs in bulk, and instructed it to stop.  Or that NECC was shipping drugs in bulk to other states.

Following the inspection, FDA Investigator Donohue informed Cadden that the FDA was still classifying NECC as a pharmacy since it was dispensing drugs pursuant to prescriptions.  In a meeting with MABOP, the FDA concluded that "so long as a pharmacy's operations fall within the scope of the practice of pharmacy (as outlined in the FDA's Compliance Policy Guide 460.200) FDA will generally continue to defer to State authorities for regulatory oversight."  Exh. 427, at 3-4.  Donohue testified that if they failed to meet the factors outlined in the CPG, the FDA could have considered NECC a manufacturer.  Trial Tr. at 34 (Nov. 14, 2018).

The following year, in September 2004, the FDA and MABOP returned to NECC to conduct an investigation.  The FDA and MABOP investigators met with Cadden and Conigliaro.  Samia Nasr, the head of the FDA's Compounding Team, testified Cadden and Conigliaro refused to provide the FDA investigators with documentation, including prescriptions, during the visit.  Trial Tr. at 28 (Nov. 15, 2018).  Conigliaro wrote a letter to the FDA in response to its requests, in which he stated, NECC "compounds numerous different sterile and non-sterile preparations to fill *patient-specific, physician prescriptions*."  Exh. 435a (emphasis added).  He further stated, "we are a small-scale, family-run, compounding-only pharmacy, not a manufacturer.  As such, we are not subject to GMP."  Exh. 435a.  Nasr testified that Conigliaro "was trying to tell us we are a compounding pharmacy.  The GMP doesn't apply to us, that everything is done right, basically, as a pharmacy.  So he is still telling us he's a pharmacy."  Trial Tr. at 35 (Nov. 15, 2018).  Conigliaro attached several documents to his letter, including a print-out from NECC's own website that showed the patient-physician-pharmacist triad.  Nasr explained, the triad is "the correct way to have a pharmacy and to be a pharmacist, the relationship between the patient, the physician, and the pharmacist.  So the patient goes to the physician when they're ill.  The physician

examine the patient and write the prescription, and then the prescription goes to the pharmacy to be dispensed." Trial Tr. at 36-37 (Nov. 15, 2018).

The FDA was also provided a copy of a letter that NECC sent to MABOP responding to an allegation that it was dispensing drugs in the names of incorrect or repetitive patient names. In the letter, Cadden wrote that "as a Compounding Pharmacy located in Massachusetts, we must always remember that each and every compounded medication shall be filled based on a valid prescription, written by a qualified physician, **for a specific patient**." Exh. 435a (emphasis in original). Samuel Penta, the supervising investigator for MABOP, testified that Cadden's statement was the correct understanding of Massachusetts law, because pharmacies "can't supply in bulk without patient-specific prescriptions." Trial Tr. at 103 (Nov. 15, 2018); Trial Tr. at 90 (Nov. 14, 2018). NECC claimed that this was a new standard operating procedure that it was implementing; it was not.

In January 2007, in response to the FDA's warning letter, NECC submitted a written response. In the response letter, Cadden wrote, "NECC dispenses compounded medications upon receipt of valid prescriptions. We are engaged in the practice of pharmacy and comply with the Massachusetts Board of Registration in Pharmacy's laws and rules." Exh. 972. Nasr testified that once again, NECC was representing it was only dispensing patient-specific drugs. Trial Tr. at 51 (Nov. 15, 2018). In its response, the FDA stated that it would exercise its enforcement discretion "contingent on factors such as the preparation of patient-specific drugs that meet medical needs for which FDA-approved drugs are unavailable." Exh. 973.

Similarly, in May 2011, MABOP investigator William Frisch inspected NECC. He spoke to Cadden and Conigliaro. During the inspection, he was told that NECC was only dispensing

drugs pursuant to patient-specific prescriptions.  Trial Tr. at 29 (Nov. 30, 2018).  He further

testified as follows:

> Q:   At any point during your inspection that day did either Mr.
>      Cadden or Mr. Conigliaro tell you that they were shipping
>      drugs when they did not have prescriptions?
>
> A:   No.
>
> Q:   At any point did Mr. Cadden or Mr. Conigliaro tell you that
>      they enter into contracts with customers that they thought
>      meant they didn't need to have prescriptions for the drugs?
>
> A:   No.
>
> Q:   And at any point did either Mr. Cadden or Mr. Conigliaro
>      tell you, "we're shipping drugs based on office stock"?
>
> A:   No.

Trial Tr. at 21 (Nov. 30, 2018).

Similarly, Nasr and Penta testified that during all of these interactions with the FDA and

MABOP, Conigliaro and Cadden always represented that NECC was dispensing drugs pursuant

to patient-specific prescriptions.  Specifically, she testified, "[i]t was, we always dispense or

compound prescriptions per patient.  That's what they told us, but we did not actually see

prescriptions."  Trial Tr. at 31 (Nov. 15, 2018).  She further testified, "[t]hey always kept saying:

We do patient-specific.  We are a compounding pharmacy.  We are regulated by the state.  We're

not – the FDA does not have jurisdiction over us."  Trial Tr. at 44 (Nov. 15, 2018).  Penta similarly

testified that NECC never represented to MABOP that it was dispensing drugs in any way, other

than pursuant to patient-specific prescriptions.  Trial Tr. at 103 (Nov. 15, 2018).

Conigliaro's misrepresentations continued during the MABOP investigation of the eye

block incident at Massachusetts Eye and Ear Infirmary ("MEEI").  The jury heard overwhelming

evidence that Conigliaro instructed Beth Reynolds to create fraudulent prescriptions to submit to

MABOP to make it appear that NECC had dispensed the eye block pursuant to patient-specific

prescriptions.  In fact, the eye block was distributed in bulk.  Reynolds created the prescriptions at

Conigliaro's direction, using a roster of names and a prescription template he provided. Conigliaro instructed Reynolds and her colleague, Michelle Rivers, to "start the 300 patient specific ones with the very next prescription number, and remember, 32 need to have two prescriptions." Exh. 659. Reynolds testified that the 300 fraudulent prescriptions she created were submitted to MABOP. Trial Tr. at 155 (Nov. 28, 2018). Dr. Sunil Eappen from MEEI testified that the 300 prescriptions Conigliaro manufactured were not legitimate prescriptions. Trial Tr. at 7 (Dec. 3, 2018). Even counsel for Conigliaro conceded in closing that manufacturing the fraudulent MEEI prescriptions was not Conigliaro's "best moment ever in the history of his life." Trial Tr. at 163 (Dec. 4. 2018). Frisch testified that when he received the fraudulent MEEI prescriptions, he believed them to be proper patient-specific prescriptions. Trial Tr. at 43-44 (Nov. 30, 2018). Frisch testified that if he had known that they were created after the fact, he would have investigated further. Trial Tr. at 44 (Nov. 30, 2018). There was no reason for Conigliaro to direct the creation of these fraudulent prescriptions other than to continue his and Cadden's deceit of NECC's true drug selling practices.

Their misrepresentations continued right up until the end of NECC. Even during the outbreak investigation in October 2012, FDA Investigation Degarmo testified that Cadden, who was with Conigliaro at the time, told her that NECC was dispensing drugs pursuant to patient-specific prescriptions. Trial Tr. at 160 (Nov. 17, 2018). The unfolding tragedy was not enough for them to come clean with the regulators. Once the regulators discovered recalled drugs arriving without patient names on them, MABOP turned over jurisdiction to the FDA. Trial Tr. at 163 (Nov. 17, 2018).

When taken together, all of this overwhelming evidence demonstrated that Conigliaro knowingly participated in a scheme to defraud the FDA. A reasonable juror could find, as these twelve jurors unanimous did, that Conigliaro is guilty of Count 3. There is no reason to substitute

the jury's conclusion as to Conigliaro's guilt with any other.  Accordingly, the Motion should be denied on this ground.

## II.    <u>Conigliaro is Not Entitled to a New Trial.</u>

In his Rule 33 memorandum, Conigliaro argues that he should be entitled to a new trial pursuant to Rule 33.  In support of this claim, he makes five evidentiary arguments in support of his claim for a new trial.  All five of his arguments are baseless and cannot meet the extraordinarily high standard of demonstrating "a miscarriage of justice or where the evidence preponderates heavily against the verdict." <u>Rodriguez-De Jesus</u>, 202 F.3d at 486.

### A.   <u>Conigliaro Was Not Prejudiced by the Denial of His Severance.</u>

Conigliaro first argues that this Court erred by denying his motion to sever, and that resulted in prejudicial spillover at trial.  This argument is wholly without merit.  "In order to be entitled to a new trial on the ground of retroactive misjoinder, a defendant must show 'compelling prejudice.'" <u>United States v. Hamilton</u>, 334 F.3d 170, 181-82 (2d Cir. 2003) (internal quotations omitted).  Prejudicial spillover requires more than a showing of joinder of trial with a more culpable defendant.  <u>See</u> <u>United States v. Martinez-Vidal</u>, 922 F.2d 914, 922 (1st Cir. 1991) ("We add that prejudice means more than just a better chance of acquittal at a separate trial.  Incidental prejudice, such that which is almost always encountered when multiple defendants playing different roles are tried together, will not suffice.").  The First Circuit has upheld the denial of severance "[e]ven when large amounts of testimony are irrelevant to one defendant, or where one defendant's involvement in an overall agreement is far less than the involvement of others." <u>United States v. Boylan</u>, 898 F.2d 230, 246 (1st Cir. 1990).  In assessing retroactive misjoinder, a court must make "an assessment of the likelihood that the jury, in considering one particular count or defendant, was affected by evidence that was relevant only to a different count or defendant." <u>Hamilton</u>, 334 F.3d at 182; <u>United States v. Mubayyid</u>, 658 F.3d 35, 73 (1st Cir. 2011) (holding

that a court must look "for a serious risk that the joinder of offenses compromised a specific trial right or prevented the jury from making a reliable judgment about guilt or innocence").

Claims of prejudicial spillover are even more dubious in cases of split jury verdicts. "The absence of prejudicial spillover is most readily inferable where the jury has convicted a defendant on some counts but not on others, indicating that the jury was able to distinguish between counts and assess separately the evidence relevant to each." United States v. Andrews, 166 Fed. Appx. 571, 573 (2d Cir. 2006). As the First Circuit has explained, "[w]here the jury renders a judgment of conviction against only some of the defendants or on only some of the charges, we are particularly reluctant to presume that the jury was unable to compartmentalize the evidence of each offense." Mubayyid, 658 F.3d at 74. See also United States v. Casas, 425 F.3d 23, 50 (1st Cir. 2005) (finding no prejudicial spillover where jury returned split verdict as to murders and conspiracy); United States v. Edgar, 82 F.3d 499, 504 (1st Cir. 1996) (finding that split verdict showed jury was "clearly capable of discriminating among the evidence applicable to each count").

In this case, Conigliaro's argument for retroactive misjoinder is grossly misplaced. First, this Court instructed the jury that each charge should be considered independently of the others to avoid any risk of prejudicial spillover. Specifically, this Court stated, "[e]ach charge and each defendant must be considered separately. You may find a defendant guilty of all charges. You may find him or her not guilty of all charges. Or you may find a defendant guilty of some charges and not guilty of others." Trial Tr. at 219 (Dec. 8, 2018). These instructions safeguarded against any potential spillover prejudice from the evidence presented against the other defendants. See United States v. Bailey, 405 F.3d 102, 112 (1st Cir. 2005) (noting "the district court took appropriate measures to safeguard against potential spillover prejudice by instructing the jury to consider the evidence separately as to each count"); United States v. Houle, 237 F.3d 71, 76 (1st

Cir. 2001) (finding no prejudice where the court instructed the jury to consider evidence separately).

Second, the jury's verdict form dramatically demonstrates that the jury followed the Court's instructions and carefully deliberated on each count and defendant separately. Specifically, after more than six days of deliberations, the jury convicted defendant Svirskiy of most of the charges against him, but acquitted defendant Evanosky of all of his charges. "Such a discriminating verdict is strong evidence that the jury successfully compartmentalized the evidence and applied the appropriate evidence to the appropriate counts." Bailey, 405 F.3d at 112.

Taken together, the clear instruction to the jury to consider each count and defendant separately, and the split verdict form after almost a week of deliberations undeniably prove that the jury properly and carefully considered the overwhelming evidence of the defendant's guilt as to the count of which he was convicted, and was not improperly influenced by any other evidence or antagonistic defenses. Accordingly, the Motion should be denied on this ground.

## B. Conigliaro Was Not Prejudiced by the Evidence of the Recycling Business.

Conigliaro's next claim that he was prejudiced by evidence of the recycling business is equally meritless. The jury heard very limited testimony about the recycling business that abutted the NECC facility. The evidence was relevant and probative to the guilt of Conigliaro's co-defendants on the charges of racketeering, mail fraud, and violations of the Food, Drug, and Cosmetic Act. Specifically, FDA Investigator Stacey Degarmo testified that the recycling center was "something that we would consider a potential route of contamination." Trial Tr. at 60 (Nov. 20, 2018). She further noted that the recycling center was included in the FDA's 483 because "we considered that to be an insanitary condition." Trial Tr. at 70 (Nov. 20, 2018). Also, there was no reason to hide the fact of NECC's location next to the recycling center from the jurors.

There is absolutely no evidence, and indeed Conigliaro points to none, indicating that the very limited evidence presented of the recycling business as an insanitary condition improperly affected the jury as it relates to his guilt on the count of conspiring to defraud the FDA.  Moreover, the Court explicitly instructed the jury that the location of the recycling business could not be scientifically proven to have been the cause of the outbreak.  Specifically, the Court stated:

> A passing statement was made in the government's opening that the recycling center was thought to be the source of the contamination in NECC's clean room, including the fungal contamination found in the MPA.  I will instruct you now that there has been no evidence presented at trial that would permit an inference on your part that that was the case.  As I remarked during the close of the trial, one of the unsolved mysteries of this case is despite the efforts of some of our nation's best health experts and scientists, no one has been able to identify with any degree of scientific certainty the actual source of the fungal contamination.

Trial Tr. at 186-87 (Dec. 8, 2018).

Given the probative nature of the recycling center as to the other counts against the co-defendants, and the Court's careful limiting instruction on its relevance, there is absolutely no prejudice that can be shown as to Conigliaro's guilt on Count 3.  There is simply no reason to think this evidence had any bearing whatsoever on Conigliaro's conviction on this count.  Accordingly, the Motion should be denied on this ground.

### C.  Conigliaro Was Not Prejudiced by an Evidence of Income Received by NECC.

Conigliaro's next argument is that he was prejudiced by evidence of the substantial income that he received from NECC.  While there was a passing reference to Conigliaro's wealth in the government's hour-long opening statement, the government elected not to call its financial investigator to testify about the millions of dollars Conigliaro made as an owner of NECC.  In his memorandum, Conigliaro fails to explain how he could have been prejudiced by the evidence of

his income, *when no evidence was actually presented* to the jury on this point.  Accordingly, the

Motion should be denied on this ground as well.

> D.   Conigliaro Was Not Prejudiced by Evidence of His Communications with State
>      Regulators.

Conigliaro next argues that he was prejudiced by evidence of his communications with

state regulators.  Specifically, he argues that the evidence of Conigliaro's communications with

state regulators did not demonstrate that he defrauded the FDA.  But Conigliaro fails to recognize

the relevance for which the evidence was presented.  As outlined supra, the government called

witnesses from Missouri, Colorado, Oregon, and Rhode Island to demonstrate that Conigliaro was

well aware that NECC was shipping drugs without patient-specific prescriptions, and he advocated

for the practice to those regulators.  Conigliaro's interactions with these regulators established that

he was well aware of NECC's business practices despite the fact that he was not directly handling

customer orders or working in the clean room.  While Conigliaro was willing to admit to Missouri,

Oregon, and Colorado that NECC was shipping drugs in bulk, he was not truthful in his

communications with the FDA and MABOP.  Indeed, Conigliaro went so far as to manufacture

fraudulent prescriptions to perpetuate the fraud rather than admit the truth to MABOP.  In sum,

evidence of Conigliaro's communications to state regulators were probative of his

misrepresentations to and conspiracy to defraud the FDA.  Accordingly, the Motion should be

denied on this ground as well.

> E.   The Limited Evidence of Patient Harm Did Not Prejudice Conigliaro Nor Merit a
>      New Trial.

Conigliaro's final claim is that he was prejudiced by evidence of patient harm.  As the

Court is aware, this was a heavily litigated point both before and during the trial.  Consistent with

this Court's rulings, the government did not present substantial evidence of patient harm beyond

the initial context for why regulators inspected NECC, and ultimately shut it down.  Specifically,

the government did not call a single victim, next-of-kin, treating physician, medical examiner, or CDC epidemiologist; and only one customer doctor who used the contaminated methylprednisolone acetate. The references to the fungal meningitis victims were sparse throughout the eight-week trial and almost always accompanied by testimony that these defendants did not have anything to do with the compounding of the contaminated drug.

On several occasions, the Court itself instructed the jury as such. At the start of the trial, the Court stated:

> I want to tell you something that I think is very important, which involves the background of this case.
>
> Behind this case was the compounding of batches of a drug called methylprednisolone acetate, or "MPA," as you will hear it referred to during the trial. This drug was compounded at New England Compounding Center in 2012. It was distributed in a number of states and deaths and injuries resulted.
>
> What I need you to keep in mind at all times is that none of these defendants are charged with any involvement in that batch of contaminated drugs, or batches as the case may be. What they are charged with is something entirely unrelated, in the sense that they have nothing, and are alleged to have nothing, to do with the deaths or injuries.

Trial Tr. at 7-8 (Oct. 15, 2018). The Court reiterated that instruction at various points during the trial. See Trial Tr. at 161 (Nov. 15, 2018) ("I've done this before, but I want to remind you that none of the defendants here have been charged with any involvement in the manufacture or compounding of the MPA that caused so much damage."); Trial Tr. at 137 (Nov. 19, 2018) ("Again, jurors, you recall that none of these defendants are charged with any involvement in the MPA action.").

There is absolutely no evidence, and indeed Conigliaro points to none, indicating that the very limited evidence presented of the fungal meningitis outbreak and its effect on victims improperly affected the jury. Moreover, the diversity of verdicts against the six defendants

demonstrates that the jury, after a week of deliberations, was careful in its analysis, and not unduly prejudiced, inflamed, or impassioned.  <u>See</u> <u>Bailey</u>, 405 F.3d at 112.  Because Conigliaro cannot show any prejudice from the limited evidence of the fungal meningitis outbreak, the Motion must be denied on this final ground as well.

**CONCLUSION**

For all of the above reasons, the United States respectfully requests that the Court deny the motion for a judgment of acquittal or, alternatively, a new trial.

Respectfully submitted,

ANDREW E. LELLING
UNITED STATES ATTORNEY

By:     /s/ George P. Varghese
        AMANDA P.M. STRACHAN
        BBO # 641108
        GEORGE P. VARGHESE
        Assistant United States Attorneys
        John J. Moakley United States Courthouse
        One Courthouse Way, Suite 9200
        Boston, Massachusetts 02210
        (617) 748-3100
        amanda.strachan@usdoj.gov
        george.varghese@usdoj.gov

Dated:  February 20, 2019

Certificate of Service

I hereby certify that the foregoing document filed through the ECF system will be sent electronically to counsel for the defendant, who are registered participants as identified on the Notice of Electronic Filing (NEF).

By:     /s/ George P. Varghese
        GEORGE P. VARGHESE
        Assistant United States Attorney

Dated:  February 20, 2019