UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| GREGORY A. CONIGLIARO, | ) |
| | ) |
| Defendant. | ) |

Court No.:  14-cr-10363-RGS–9

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America hereby submits this memorandum in support of its sentencing recommendation for defendant Gregory Conigliaro.  Taking into account Conigliaro's sentencing guidelines range, as well as the factors set forth in 18 U.S.C. § 3553, the Government recommends that the Court sentence Conigliaro to 18 months of incarceration, the low-end of the advisory sentencing guidelines range, and impose a fine of $250,000.

Defendant Conigliaro now stands before this Court convicted of conspiring to defraud the United States in violation of 18 U.S.C. § 371.  Specifically, Conigliaro conspired with Barry Cadden ("Cadden") and others at NECC to represent to the Food and Drug Administration ("FDA") and the Massachusetts Board of Registration in Pharmacy ("MABOP") that NECC was operating as a pharmacy dispensing drugs only pursuant to patient-specific prescriptions, when, in actuality, it was operating like a generic drug manufacturer distributing drugs in significant quantities throughout the country in bulk.  Though Conigliaro was not involved in the compounding of the preservative-free Methylprednisolone Acetate ("MPA") that led to the deadly nationwide outbreak of fungal meningitis, nor did he oversee or work in the clean rooms where those and other substandard drugs were compounded in unsafe conditions, he contributed to this tragedy by helping NECC avoid the FDA's regulatory oversight and operate in an unsafe, and

ultimately deadly, manner.  Conigliaro and his co-conspirators' fraud on regulators was highly lucrative for him and his sibling co-owners; it enabled NECC to distribute a high volume of drugs without taking the appropriate and necessary steps to ensure their safety.  Registering NECC with the FDA and operating legally and safely as a cGMP-compliant drug manufacturer—something he and his fellow co-owners discussed in management meetings and decided against—would have cost them time, effort, and money.  Instead, he and his co-conspirators chose to defraud regulators and operate faster and illegally, and that choice—one of profits over patients—proved devastating. Conigliaro's serious and grave offense warrants a significant sentence of incarceration.

## BACKGROUND

Conigliaro was convicted of conspiring with others at NECC to deceive the FDA into thinking one thing when another thing was in fact true.  He did so by misrepresenting to the FDA and MABOP that NECC was only dispensing drugs pursuant to patient-specific prescriptions when he knew that was not true, and instead, that they were shipping drugs in bulk across the nation.  Through this deceit, Conigliaro and NECC were able to avoid the FDA's oversight authority—and the FDA's requirement that drug-manufacturers follow cGMPs—and operate in a slipshod, unsafe manner, ultimately leading to the tragic outbreak of fungal meningitis that killed more than one hundred individuals and injured many hundreds more.

### *Conigliaro Knew NECC was Dispensing Drugs in Bulk Without Patient-Specific Prescriptions*

Conigliaro was part-owner of NECC and had been involved with NECC since the founding of the company in 1998.  PSR ¶ 23; Trial Tr. at 156-57 (Nov. 16, 2018).  Conigliaro held the official titles of Vice-President and General Manager of NECC and had critical responsibilities there, particularly with respect to interacting with federal and state regulators—for whom he was the primary point of contact at NECC.  As part of his role, Conigliaro attended NECC's

management meetings and signed licenses on behalf of the company.  PSR ¶ 23; Trial Tr. at 73 (Dec. 3, 2018); Trial Tr. at 160 (Nov. 28, 2018).  Though Conigliaro told the Probation Officer drafting the PSR that he cannot recall his salary at either NECC or Medical Sales Management ("MSM"), PSR ¶¶ 122-23, it is undisputed that he received millions of dollars as a result of his ownership interest in NECC.  PSR ¶ 23.

During Conigliaro's trial, the Government introduced overwhelming evidence that NECC was shipping drugs without patient-specific prescriptions for over a decade—disregarding specific instructions from state regulators to cease doing so.  *See* PSR ¶¶ 37-41; Trial Tr. at 66-67 (Nov. 8, 2018) (Missouri Board of Pharmacy discovered in 2002 that NECC was unlawfully shipping drugs into the state of Missouri without patient-specific prescriptions and instructed NECC to stop doing so); Exh. 696, Trial Tr. at 98-100 (Nov. 14, 2018) (South Dakota reported to MABOP that NECC was attempting to ship non-patient specific drugs into the state and MABOP in turn issued a letter to NECC instructing it to cease the practice); Exh. 697, Trial Tr. at 100-102 (Pharmacists in Iowa and Wisconsin reported to MABOP that NECC was attempting to ship drugs into their respective states without patient-specific prescriptions and MABOP in turn issued a letter to NECC instructing it to cease the practice); Exh. 614 ("This is a long standing account (2005) and they have NEVER given us [patient] names."); Exh. 517 (customer "has ordered 252 times from us and never provided patient names").

Conigliaro himself was also well-aware that NECC shipped drugs throughout the country without patient-specific prescriptions despite objections from regulators, and he pushed back whenever a regulator questioned or objected to NECC's practices.  *See* PSR ¶¶ 42-45; Exh. 438; Trial Tr. at 85-95 (Nov. 8, 2018) (Conigliaro submitted a list of drugs shipped to Missouri in the names of the facility, reusing patient names, backfilling patient names, and using doctors' names

for prescriptions); Trial Tr. at 161-162 (Nov. 8, 2018) (MOBOP instructed Conigliaro that by compounding and shipping in bulk, NECC was acting as a drug "manufacturer" and so "would need to be following CGMP and FDA requirements and [be] under FDA oversight" and that NECC should "register with the FDA." ); Trial Tr. at 103-109 (Nov. 9, 2018) (after discovering that NECC was shipping drugs into Colorado in bulk, the Colorado Board of Pharmacy ("COBOP") issued a cease-and-desist order to NECC to stop shipping drugs into the state without patient-specific prescriptions; Conigliaro responded with an angry phone call to COBOP, claiming wrongly that NECC was permitted to ship drugs into Colorado in bulk; and NECC continued shipping drugs in bulk to Colorado); Exhs. 447, 453, Trial Tr. at 60-61 (Nov. 9, 2018) (Conigliaro falsely represented to the Oregon Board of Pharmacy that NECC was providing services to Oregon hospitals pursuant to "shared services agreements" that allowed the pharmacy to ship drugs in bulk, when, in fact, no such agreements existed and NECC was only allowed to ship drugs to Oregon pursuant to patient-specific prescriptions).  His efforts to defend NECC against investigator inquiries and mislead boards of pharmacy enabled NECC to keep operating.

***Conigliaro and His Co-Conspirator Cadden Repeatedly Misrepresented to the FDA and MABOP that NECC was Only Dispensing Drugs Pursuant to Patient-Specific Prescriptions.***

Though he was well aware that NECC was routinely shipping drugs to customers throughout the country without patient-specific prescriptions, from 2002 through 2012, Conigliaro (and his co-conspirators) always represented to the FDA and MABOP that NECC was only dispensing drugs pursuant to valid, patient-specific prescriptions—going so far as to create fraudulent prescriptions and present them to regulators to conceal NECC's true activities, as discussed further below.  PSR ¶¶ 46-54.

As examples, in September 2004, the FDA and MABOP conducted an inspection of NECC and met with Cadden and Conigliaro.  During this inspection, Conigliaro and his co-conspirator

Cadden refused to provide FDA investigators with documentation, including prescriptions, instead telling the FDA to put their requests in a letter, which the investigators did.  Trial Tr. at 28 (Nov. 15, 2018).  Subsequently, Conigliaro responded to FDA investigators with a letter asserting that NECC was "a small-scale, family-run, compounding-only pharmacy, not a manufacturer.  As such, *we are not subject to GMP*" and that NECC "compounds numerous different sterile and non-sterile preparations to fill *patient-specific, physician prescriptions*."  Exh. 435a (emphasis added).

Samir Nasr, the then-head of the FDA's compounding team testified NECC "always kept saying: We do patient-specific.  We are a compounding pharmacy.  We are regulated by the state. We're not – the FDA does not have jurisdiction over us."  Trial Tr. at 31, 44 (Nov. 15, 2018). Samuel Penta, a MABOP investigator, testified similarly.  Trial Tr. at 103 (Nov. 15, 2018).

When MABOP inspected NECC in 2011, neither Cadden nor Conigliaro informed the MABOP inspector that (i) NECC was dispensing drugs without patient-specific prescriptions; (ii) that NECC entered into "contracts" with some hospital customers to avoid prescriptions for the drugs it shipped; or (iii) that NECC was shipping drugs for office stock, a practice that was not allowed in Massachusetts or by pharmacies licensed in Massachusetts.  Trial Tr. at 21 (Nov. 29, 2018).

Conigliaro's misrepresentations continued during the MABOP investigation of a serious adverse event involving NECC's shipment of a significantly subpotent eye anesthetic to Massachusetts Eye and Ear Infirmary ("MEEI").  *See* PSR ¶¶ 55-57.  During the course of that investigation, which occurred in the summer of 2012 mere months before the fungal meningitis outbreak, Conigliaro directed NECC employees to create from scratch 300 fraudulent prescriptions, and then submitted the fake "prescriptions" to MABOP, falsely representing them to be the actual prescriptions for MEEI patients.  This fraud, which Conigliaro and Cadden together

orchestrated, obstructed MABOP's investigation into NECC and concealed NECC's true operations at a critical point in time. Trial Tr. at 155 (Nov. 28, 2018). The MABOP investigator conducting the audit of the incident testified that he was deceived into believing that they were actual prescriptions that MEEI had sent to NECC. Trial Tr. at 42-43 (Nov. 30, 2018). During the MEEI incident, Conigliaro knew that NECC's substandard (and untested) eye block caused patients at MEEI to undergo eye surgery without anesthesia. He knew NECC's drug had caused patient harm. And yet, his response showed little concern either for those patients or for the patients whose names he directed employees to use to create fictitious prescriptions. Instead, he responded, as he had with other prior board of pharmacy' inquiries, by protecting NECC's business operations. Once again, Conigliaro's lies in the name of protecting NECC allowed it—in the summer of 2012—to continue to operate business as usual.

Less than four months later, Conigliaro made a similar choice. He and Cadden maintained their false scheme even when people were dying during the fungal meningitis outbreak in October 2012, continuing to falsely claim to the regulators that NECC was dispensing drugs only pursuant to patient-specific prescriptions. PSR ¶ 66 Trial Tr. at 160 (Nov. 16, 2018). It was not until MABOP Investigator Samuel Penta saw packages of recalled and returned MPA come back to NECC without patient names on them that MABOP and FDA learned the truth.

***But-For Conigliaro's False Statements (and Those of His Co-Conspirators), the FDA Would Have Regulated NECC and Required it to Follow cGMPs.***

If MABOP and the FDA had been aware that NECC was shipping drugs in bulk without patient-specific prescriptions, they would have treated NECC as a drug manufacturer under FDA's oversight and NECC would have been subject to the more stringent cGMP standards. *See* Trial Tr. at 101 (Nov. 15, 2018) (Samir Nasr) (testifying that if FDA understood NECC's practices "we would walk in and do the inspection based on the GMP right away"); Trial Tr. at 164 (Nov. 16,

2018) (Stacey Degarmo) (testifying that MABOP turned over jurisdiction to FDA upon discovery of non-patient-specific drugs); Trial Tr. at 111-12 (Nov. 19, 2018) (Janet Woodcock) (testifying that "if a company crossed that line and becomes a manufacturer … we [the FDA] would make sure that they were conforming to our manufacturing standards."); Trial Tr. at 111-12 (Nov. 19, 2018) (Janet Woodcock) ("[I]f they were getting staff members or other non-patient names on prescriptions, then they would be a manufacturer under the scheme in place at that time.").

In short, Conigliaro was successful—for years—in defrauding regulators and avoiding compliance with the FDA's heightened cGMP requirements applicable to drug manufacturers. When a regulator asked a question, Conigliaro facilitated the response to protect NECC and its operations.  Ultimately, NECC—subject to lax state oversight, plagued by filthy conditions, and defying basic safety standards—shipped drugs that were tainted, untested, and deadly.  These drugs were injected into hundreds of patients—at the time of the outbreak, over 17,000 vials of tainted lots of MPA had been distributed around the country.  More than one hundred patients ultimately died and hundreds more were terribly injured.

## SENTENCING RECOMMENDATION

In determining a defendant's sentence, the court must consider the Sentencing Guidelines and determine the advisory sentencing guideline range which, once calculated, establishes the court's "starting point" or "initial benchmark." *Gall v. United States*, 522 S. Ct. 38, 49 (2007). After doing so, the court should consider the various factors set forth in 18 U.S.C. § 3553(a). Only after consideration of those factors should the court reach its ultimate determination. *United States v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008).  The Supreme Court has observed that "in the ordinary case, the [GSR] will 'reflect a rough approximation of sentences that might achieve

§ 3553(a)'s objectives.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)).

<div align="center">

***Calculation of the Sentencing Guidelines Range***

</div>

The Government agrees with the United States Probation Office ("USPO") that Conigliaro's Guidelines Sentencing Range ("GSR") should be calculated as follows:

|  | **Offense Level** |
|---|:---:|
| Base offense level (§ 2C1.1(a)(2)) | 12 |
| - Manager or supervisor of criminal activity (§3B1.1(c)) | +3 |
| **Total Offense Level** | **15** |

Specifically, the Government agrees with the PSR's inclusion of a three-level increase pursuant to § 3B1.1(b) because Conigliaro acted as a manager or supervisor of criminal activity involving five or more participants. Conigliaro was a part-owner, and the Vice-President and General Manager of NECC and had been involved with NECC's business strategy and development, along with his brother and brother-in-law (Cadden), since the founding of the company in 1998. Conigliaro attended NECC's management meetings and signed licenses on behalf of NECC and was the primary point of contact at NECC for federal and state regulators— a crucial role for keeping the company in business. Based on his ownership stake, Conigliaro received millions of dollars from NECC.

Based on an offense level of 15, and a criminal history category of I, Conigliaro's GSR is 18-24 months.

### *The Sentencing Factors Under 18 U.S.C. § 3553(a)*

*The Nature and Circumstances of the Offense and the Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence to Criminal Conduct*

The nature and circumstances of the offense here warrant a substantial sentence of incarceration, and such a sentence is necessary to "reflect the seriousness of the offense," "promote respect for the law," "provide just punishment for the offense," and "afford adequate deterrence to criminal conduct." 18 U.S.C. §§ 3553(a)(2)(A)-(B).   In this case, the Sentencing Guidelines provide for an appropriate sentence for Conigliaro.

For years, NECC operated in a grossly unsafe manner—manufacturing drugs in unsterile conditions, using expired ingredients, failing to test drugs prior to shipment, shipping drugs despite non-sterile testing results, and ignoring cleaning and environmental monitoring.   Though he did not know the details of the drug manufacturing operation, Conigliaro's fraudulent scheme enabled this.   By concealing the fact that NECC was operating as a drug-manufacturer, Conigliaro allowed NECC to avoid the FDA's more stringent oversight and to avoid compliance with cGMPs—rules intended to ensure the "safety, … quality and purity" of manufactured drugs. 21 C.F.R. § 210.1(a). Indeed, this was the very point of Conigliaro's scheme; he specifically and falsely told regulators that, because NECC was "a small-scale, family-run, compounding-only pharmacy, not a manufacturer," NECC was "*not subject to GMP*."   Exh. 435a (emphasis added).   Even after he saw in the MEEI incident that NECC's drug-making operations had harmed patients, he stayed on course.

Conigliaro and his co-conspirators' scheme to deceive the FDA succeeded.   Because the FDA was deceived by NECC, it deferred jurisdiction to MABOP.   *See, e.g.,* Trial Tr. at 64 (Nov. 15, 2018) (testimony of FDA investigator Samira Nasr) ("[W]e could not determine [if NECC was

a manufacturer] because they would not allow us to see what they were doing to start with."); *id.* at 100 (Nov. 15, 2018) ("[T]hey never told us what they were doing. We tried to understand and have them explain to us what they do, but they never allowed us to know."); *id.* at 101 (testifying that if FDA understood NECC's practices "we would walk in and do the inspection based on the GMP right away"); Trial Tr. at 164 (Nov. 16, 2018) (Stacey Degarmo) (testifying that MABOP turned over jurisdiction to FDA upon discovery of non-patient-specific drugs); (Trial Tr. at 111-12 (Nov. 19, 2018) (Janet Woodcock) (testifying that "if a company crossed that line and becomes a manufacturer … we [the FDA] would make sure that they were conforming to our manufacturing standards."); ("[I]f they were getting staff members or other non-patient names on prescriptions, then they would be a manufacturer under the scheme in place at that time."). Conigliaro's conduct was necessary for NECC to continue to operate in the grossly unsafe manner. His illegal scheme succeeded until the 2012 outbreak—which happened precisely because of NECC's unsafe and corner-cutting mode of operation and because NECC failed to take the safety measures necessary to ensure the sterility of the high-risk products it sold.

Conigliaro's sentence should take account of the dangerousness and seriousness of his conduct—which weighs in favor of a significant sentence of incarceration.

*The Characteristics of the Defendant*

The Government agrees that, but for his criminal conduct and his involvement with NECC and the most significant pharmacy-related health crisis in United States history, Conigliaro has otherwise led an exemplary life, including a record of meaningful military service.

The government believes that its recommendation of a sentence at the low-end of the GSR adequately accounts for this record.

*The Need to Avoid Unwarranted Sentence Disparities Among Defendants*

The Government's proposed sentence adequately accounts for Conigliaro's relative culpability among his co-defendants who, like Conigliaro, were convicted at trial and have been sentenced to-date, as reflected in the table below:

| Defendant | Sentence |
|---|---|
| Barry J. Cadden | 174 Months |
| Glenn A. Chin | 126 Months |
| Gene Svirskiy | 30 Months |
| ***Gregory Conigliaro*** | ***18 Months*** |
| Christopher Leary | 8 Months Home Confinement 2 Years' Probation |
| Alla Stepanets | 1 Year Probation |
| Kathy Chin | 2 Years' Probation |
| Michelle Thomas | 1 Year Probation |

Conigliaro's culpability is indisputably far below that of his co-defendants, Cadden and Glenn A. Chin.  Unlike both, Conigliaro played no role compounding drugs at NECC, was not present in or aware of the filthy and dangerous conditions in NECC's supposed clean rooms, and had no part in the compounding or distribution of the tainted MPA that led to the tragic fungal meningitis.

Those same factors distinguish Conigliaro from co-defendant Gene Svirskiy—who oversaw operations in NECC's Clean Room 2, and, like Cadden and Chin, fraudulently conspired to distribute drugs he knew to be substandard and compounded in contaminated conditions—and suggest that Conigliaro is relatively *less* culpable than Svirskiy.  This distinction, however, is balanced by the fact that Conigliaro held a role of far greater seniority and decision-making authority than Svirskiy.  Conigliaro held an ownership stake in NECC and reaped millions from its operations.  He was a director of the business and exercised his authority to interact with—and often cow—state regulators to perpetuate the scheme from which he profited.  And he personally

authored fraudulent representations that were intended to, and had the effect of, deceiving and obstructing state and federal regulators.  In short, unlike Svirskiy, Conigliaro was a true architect and facilitator of NECC's fraudulent scheme to deceive regulators.

The government submits that these factors—one that mitigates Conigliaro's relative culpability vis-à-vis Svirskiy and one that aggravates it—could be viewed in near equipoise and suggest that Svirskiy's sentence of 30 months provides an appropriate benchmark for the Court to use in imposing a sentence on Conigliaro.  This benchmark suggests that a sentence within the GSR—18 to 24 months—is within a reasonable range.

<div align="center">*    *    *</div>

Conigliaro committed a grave, serious offense—obstructing the work of a federal agency—the FDA—whose role is precisely to ensure the safety, purity, and efficacy of manufactured drugs.  He did so through lies, false schemes, and misrepresentations—all in service of NECC's profits—of which Conigliaro received millions of dollars.  Conigliaro's dangerous, and ultimately deadly, offense warrants a severe and significant punishment.

## CONCLUSION

For all the above reasons, the United States respectfully requests that the Court sentence Gregory Conigliaro to 18 months of incarceration and impose a fine of $250,000.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:    */s/ Amanda P.M. Strachan*
AMANDA P.M. STRACHAN
CHRISTOPHER R. LOONEY
Assistant United States Attorneys

Dated:  November 25, 2022

**Certificate of Service**

I hereby certify that the foregoing document filed through the ECF system will be sent electronically to counsel for the defendant, who are registered participants as identified on the Notice of Electronic Filing (NEF).

By:     */s/ Christopher Looney*
        Christopher Looney
        Assistant United States Attorney

Dated:  November 25, 2022